Our first case for today is 2023, 10952, United States of America v. Alvaro Alejandro Mancilla. We'll hear from Mr. Mickelson first. My name is Franklin Mickelson, and I represent the 21st century smuggler Alvaro Mancilla. This court in Diaz held that because Diaz's prior conviction for theft was punishable by death in the colonial era and early republic. It stands to reason that the lesser penalty of depriving someone convicted of theft fits neatly within this country's historical tradition. So the question in this case is whether disarming a convicted smuggler fits neatly within this country's historical tradition. During the colonial era, Britain imposed a mercantilist system on American colonies, generally prohibiting them from trading with other countries, beginning with the imposition of the Navigation Act of 1651. There was no death penalty for a violation of the Navigation Acts. In 1733, Britain enacted the Molasses Act, which regulated the colonial rum industry in the United States. There was no death penalty for the illegal trade in rum. Does it matter whether there's a death penalty? Is that the historical analog, whether there's a death penalty? Why is that being focused? Because that was the reasoning in Diaz, essentially. That if theft could be punished by death, that was a greater deprivation of the defendant's rights than prohibiting them from possessing a firearm. If you could kill someone, essentially. But the government doesn't have to go all the way to death in order to prevail, does it? No, I don't think so. But then there otherwise would need to be some reason to believe in the colonial era or the early republic sometime near the founding that there was a prohibition against someone being convicted of an analog offense of being prohibited from having a firearm. I mean, suffice it to say, not only is there no death penalty for violation of smuggling under the Navigation Act, the Molasses Act, the Sugar Act, or the Townsend Acts that led to the American Revolution, there was no deprivation of anyone's rights to bear a firearm. Do you believe smuggling molasses and sugar and avoiding the taxes of those are analogous to transporting cocaine? Yes, I do. I think these are smuggling offenses. I think smuggling is smuggling. I think whether it's smuggling like in the Lacey Act for the Gibson Guitar Company, Ebony from Madagascar, whether smuggling cocaine, whether smuggling alcohol in violation of the prohibition in the 1920s, these are all various forms of smuggling. And I think smuggling is the analog. How has this been treated in the other circuits to date? Essentially, what I understand is that I'm going to have a—Durarte, I think, was the latest decision in the Ninth Circuit. We have a split in the circuits. Some of the circuits are saying basically that any felony is sufficient. That is the government's position generally at this point unless it changes. But that's not our case law. That is not the case law. Our case law is not that any felony is sufficient. We parse. And Diaz itself says it wouldn't always be. So that's a somewhat friendly question. Yes. So I'm asking what have—for the circuits that parse, what is the lay of the land on drug trafficking? I would assume there would be some of the cases would be drug trafficking cases. I do not know of precedent where this issue, whether a conviction simply for drug trafficking, prohibiting a person convicted of any kind of drug trafficking is prohibited by the second—prohibition of that person from ever possessing a firearm is prohibited by the Second Amendment. So first impression. I think this is—yes. And, of course, this Court is aware there's two other cases pending before this Court. In one of those cases, my understanding, the defendant has another conviction. So that may not be—but I think it was in—I'm sorry. In your client, Debbie. Kimball, maybe. Yeah. I can't remember if it was Orozco or Kimball. But I think at least one other case is purely like this case where we simply have a prior conviction for drug trafficking. And let me say, I do think because the Supreme Court has said that if there's a clear threat of violence based on the conviction, then that's a different case. So, for example, if a defendant was convicted of a 924C or some kind of robbery in connection to a drug charge or some kind of assault and— But he had a history of violent crime. Yes. Previous or subsequent. Maybe putting the two things together. Yeah. That would make sense. But simply being a drug trafficker, simply—which is what my client was doing here. He was convicted of smuggling cocaine. He is a smuggler. What is the way forward for your client in this? Do you want to talk about the historical analogs again or whatever? How would you say we would write this so that your client could prevail? I believe that there is no historical analog. The government has the burden of showing a historical analog. There is no historical analog for saying that someone who is convicted of a smuggling offense, which is— There's plenty of historical analogs from the early republic and the colonial era. None of those people were prohibited from carrying a firearm. None of those people were ever held to be a clear and present danger. And because of that, the Second Amendment precludes these individuals from forever being prohibited from possessing a firearm. But when you talk about smuggling and the historical analogs, you're not talking about substances or goods that are just illegal to possess. It's not illegal to possess molasses, is it? No. You're talking about molasses and sugar and alcohol. It was illegal to smuggle rum, for example, under these acts into the country unless it came from a certain location. So that's true. Now, under the Volstead Act in the 1920s, alcohol was basically a controlled substance, was basically a prohibited substance. And under the Volstead—I think that's an interesting—it's way after the framing, obviously. But under the Volstead Act, if you were convicted of rum-running alcohol, running rum from the Bahamas into the United States in the 1920s, you couldn't have had your rights to possess a firearm prohibited forever. And although in all these acts, whether it be smuggling in the colonial era or during the early republic or in the 1920s under the Volstead Act, there was always a potential for violence. In fact, there's always a potential for violence in any kind of criminal activity, whether it be prostitution, smuggling, or smuggling a substance that—an illicit substance. All these carry the potential for violence. But they don't necessarily. There were people that ran speakeasies under the Volstead Act who were violating the law but weren't violent. There are kids distributing marijuana at UT Austin who are distributing drugs, who are smuggling drugs, but aren't violent. I think it takes more than simply being a carrier, a mule, convicted of being a mule, to justify under the Second Amendment a forever prohibition of carrying a firearm. Well, can we talk again about the other circuits? Because the government's 28J just absolutely says that even the Third and the Sixth Circuit would have said that disarming felon drug traffickers is consistent with the nation's historical tradition of disarming the dangerous. And they cite Williams and White. I believe it's fair, and I may have them mixed up, but I believe it was clear in one of the cases where they simply said any violation for— so, actually, earlier I misspoke. Now I recall. One of the circuits did say any drug conviction was a basis for a prohibition consistent with the Second Amendment. That drugs are dangerous, basically. Yes. And then the other circuit, to be fair, it was not that defendant. They said, as applied to that defendant, and there was drugs and violence. Do you believe we should look at the defendant's specific conduct in determining that, or should we look at the type of offense? Are drug trafficking offenses inherently dangerous, or should we look at whether the drug trafficking that your client engaged in was dangerous? I think— As an applied challenge. As an applied challenge, I think it needs to look at the individual defendant. And I would certainly think, as an applied challenge, a broad rule, like I think it was the Third Circuit, but whichever circuit that said all drug trafficking is inherently dangerous, and so therefore any prohibition of anybody convicted of this crime, any prohibition of their firearm forever is consistent with the Second Amendment. I disagree with that, obviously. I think that is far too broad. There would be convictions that wouldn't imply danger. I think it's just—in Rahimi, the Supreme Court said a clear threat of violence justified it. And I don't think under—again, if we go back into history, there was any analog where you said a broad class of offense justifies prohibiting someone from bearing a firearm. I mean, there were—in fact, in Virginia, for example, there was a law that said that you could not prohibit somebody who was in the militia. You couldn't even arrest them for bearing a firearm. Now, that might be too broad the other way, but there's just nothing like this in the early history of the United States to suggest that some— I mean, essentially, again, we're talking about smuggling offenses. We're supposed to look for analogs. I think—and to go to Judge Graves' point, I actually disagree with my counsel in Kimball on Orozco. If I understood their arguments right, they're simply trying to say controlled substances weren't prohibited in the colonial era. So anything dealing with a controlled substance doesn't have an analog. And I don't think that's fair either to be candid with the court. I think the analog is these are smugglers. These are people that engage in activity of breaking the law, of bringing things—I mean, marijuana is—may be legalized in the next decade. And so suddenly now this illicit substance is a legal substance. But smuggling is smuggling. And anytime there's a black market and smuggling, there is the potential for some danger. But I think in an applied challenge, you have to look and see, is there something about this defendant? Was he using a gun in relation to the smuggling? Was he doing something dangerous? Was there violence in relation to the conviction? Just a broad categorical, anybody convicted of this kind of smuggling offense is prohibited forever, barring a firearm does not seem consistent with this country's tradition and history. Can you remind us what the breakdown was in the Ninth Circuit case between—what was the majority and the dissent in that? Honestly, no. I don't have it with me today for some reason, and I just wanted to double-check that. Yeah, I know the Ninth— So, because it seems that, you know, we kind of—with Rahimi, we opened up this really important, interesting constitutional issue. And it seems that we're in the process now, perhaps some might say, of trying to figure out what happens when this interesting constitutional issue is dealing in this most common context that we experience it with felons and firearms. And so some circuits now are shutting the door even to nonviolent activity, and some are continuing to parse and finding a way forward of whether or not we can—whether you can permanently be banned from possessing a firearm as part of having been convicted of a felony, of which there are many, both violent and nonviolent. I agree with Your Honor, and I think that under Rahimi, I think those courts are wrong that are just saying it's okay. To say simply all felons can be prohibited, Rahimi said it was presumptively. The law is that it is presumptively legal. That suggests there would be exceptions. And I think, for example, you could have felons that have committed regulatory violation, illegal dumping. It could be somebody importing illegal wood to make high-end guitars. These people, I think, would be the people that are the—who meet that presumption, who should not be subject to a complete ban for felons under the Second Amendment. I'll reserve my time.  Good morning, and may it please the Court. John Bradshaw for the United States. In 2010, Mancia left his home in Brownsville. He went to Mexico. He got a small package of cocaine worth more than $70,000. He smuggled that cocaine into the United States, and he was caught with it, and he pled guilty to a federal drug trafficking crime. After serving his sentence and his supervised release, Mancia and his associate drove from Brownsville more than 500 miles up to Fort Worth, where they went to a gun show. They went around to different tables, and they were looking for people who would sell them firearms without doing a background check. They bought three high-powered rifles, and police found Mancia and his associate in possession of those rifles, two more firearms, and approximately $27,000 in cash. Mr. Mancia pled guilty to violating 18 U.S.C. section 922 G1, and the only claim that he has preserved here is an as-applied Second Amendment challenge. His as-applied Second Amendment challenge fails in light of two principles from this nation's history and tradition. The first principle that Chief Judge Elrod mentioned, and this Court cited in Bullock and Schnur, is the principle that the government can disarm the dangerous. Judge Elrod, you were asking about where the other circuits are. So the Sixth Circuit in the Williams case acknowledged that felons could come forward on an as-applied basis and litigate this issue felony by felony. And in addressing that, Williams anchored its analysis in dangerousness, and it said there are sort of three buckets of crimes. The first bucket is crimes where someone has committed violence against someone else, and those crimes, Williams said, almost always exhibit dangerousness, and it would be hard for someone with one of those convictions to come forward and show that they're not dangerous in the future. And then I'm going to quote from Williams at page 659. A second category of crimes, while not strictly crimes against the person, may nonetheless pose a significant threat of danger. These crimes do not always involve an immediate and direct threat of violence against a particular person. A prime example is drug trafficking. Drug trafficking is a serious offense that in itself poses a danger to the community. In addition, it often leads to violence. Judge Elrod, you asked whether in applying this rule, if this court were to say drug traffickers are inherently dangerous, do we have to look at this particular felon's drug trafficking to see if there are marks of danger, did he use a firearm, was there a shootout, that sort of thing, or can you look at the principle more broadly? I think Diaz teaches that you look at the principle more broadly, and Diaz, the conviction was theft, and even though it was a motor vehicle theft and this court analogized that to horse theft, many panels of this court thereafter have applied the rule of Diaz to say if you have a prior felony theft conviction, then your argument is foreclosed in the Fifth Circuit. So I think this court should say that drug trafficking is dangerous and therefore a basis for disarmament, and in doing that it would be joining the Sixth Circuit. When you say it's danger, you quoted Williams, which talked about a danger to the community. Is that danger from people using drugs or some danger from the people who are selling drugs and are using guns to facilitate the sale of the drugs or to protect themselves when they're selling whatever they use guns for, which is apparently for a lot of things when they sell drugs, but which danger are you talking about? Yes, Your Honor. Williams is talking about the second category of danger that you've identified, so that's the danger where drug traffickers are armed, and this gets back to the nature of drug trafficking, and Judge Graves, your question to my friend on the other side hit on this. When you traffic drugs, it's a controlled substance. There is no sort of legitimate use for cocaine. It's not like wool or rum that you would be evading tariffs on. And so when you have cocaine, there is no legitimate market for cocaine. There's no insurance for cocaine. If your drugs get ripped off, you rarely call the police. Instead, what we see in case law is drug traffickers arm themselves to protect the product, to protect the money, to protect their territory, and often drug trafficking leads to violence, even if it's not in every single case. In Williams, the Sixth Circuit said what I just quoted, and then in White, an unpublished decision from the Third Circuit adopted that same analysis in rejecting an as-applied Second Amendment challenge to someone with a prior drug trafficking conviction and an aggravated assault conviction and an unlawful possession of a firearm conviction. All of that to say, if this court were to hold that prior felon drug traffickers could not be disarmed consistent with the Second Amendment, I think it would be on an island. I don't think there's any other circuit that has said that. Chief Judge Elrod, you asked about where are the other circuits on this. Briefly, five circuits have foreclosed as-applied challenges, so that's the fourth. Yeah, and we can't do that. You understand that we cannot foreclose as-applied challenges because our case law in Diaz itself says that we're not doing that. I think that's right. I mean, that's the position the government has taken post-Diaz. I understand Judge Higginson views the world slightly differently, but the position the government has taken in this case and cases post-Diaz is that Diaz forecloses the government's threshold argument that all felons count. Right. Diaz says all felons don't count. You can't do it at that level of generality. Right. You would have to go en banc as the government or whoever to challenge that we do recognize an as-applies challenge here. We read Diaz the same way, and that's why we briefed this case the way we did. Go ahead. I'm sorry. No, absolutely. That said, even the courts that recognize as-applied challenges have suggested that drug traffickers are inherently dangerous and therefore subject to disarmament. I'm wondering, though, can you go back to the proposition that you were very kind to answer the question that I had asked your friend on the other side about whether we look at the particular facts of this crime. Diaz says you're not supposed to look too generally, and so I'm just wondering if a label is too general. Drug trafficking, as was illustrated earlier, can be a lot of different circumstances. And so can theft. And I think after Diaz, every felony theft this court has treated as foreclosed by Diaz. For defendants with prior theft convictions, I have not seen this court draw any sort of distinction between the amount of theft, what was stolen, the circumstances in the theft. It's sort of after Diaz in this circuit, theft is theft, and felony theft is sufficient for disarmament. Do you think that's consistent? Do you think we should go on bonk on that? Is that consistent? Diaz has some language on the one hand and on the other hand. Sure. I think in addressing an as-applied challenge, it's important to look at the defendant's sort of particular characteristics. Now, I will say in the Sixth and the Third Circuits, the courts are looking beyond simply the felony that's disqualifying. They're taking a much broader look at whether a person is dangerous, including all of their criminal history. So that's other arrests, misdemeanor convictions, and instant offense conduct. And I think this court should look at instant offense conduct when it is assessing dangerousness. And here, the instant offense conduct also indicates dangerousness. Can you elaborate on that? Absolutely. In addressing an as-applied challenge, first of all, there's nothing in Diaz. I've seen arguments made this way, but there's nothing in Diaz that says you cannot look at instant offense conduct when addressing dangerousness, because Diaz didn't do the dangerousness analysis. Diaz's analysis is rooted in the idea that if you have a felony for theft, that is comparable to a felony that was punished by death at the founding. But this court has not addressed straight up whether, in assessing its dangerousness framework, whether you can look at instant offense conduct. But it absolutely should. As the Sixth Circuit and Williams and the Third Circuit, in a case called Pastilles v. Barr that I cited in a 28J, make clear, the inquiry when you're assessing someone's dangerousness should be much more holistic. And then on this defendant's particular dangerousness, he drove 500 miles away from his home in Brownsville to a gun show, and him and his associate had about $30,000 in cash. They were found with $27,000 in cash, but they had already purchased two firearms for approximately $3,000 in cash. When you read the detention hearing transcript, which we ordered in advance of this appeal, it is clear that the case agent who testified there is concerned about gun running and these guns being smuggled back into Mexico. What he says is you have a defendant with a prior drug trafficking conviction, so he's got a source in Mexico for controlled substances. Then he's up in Dallas, 500 miles away from his home, buying high-powered rifles that Mexican drug dealers are interested in, and then he's bringing those back into Mexico. So we think that the instant offense conduct here does it. Go ahead. Do you have a question, Judge Graves? I'm sorry.  I'm sorry. The instant offense conduct does indicate dangerousness, and we do think that dangerousness. So even if we didn't want to just have a category, you think this instant offense is satisfactory? I think absolutely. When you take all of Mr. Mancilla's history together, he is dangerous, and he's dangerous under the Sixth Circuit's analysis in Williams, and then when you look forward to his instant offense conduct, it's not someone who was convicted of drug trafficking 35 years ago and has lived a life sort of like Brian Range, for example, a life free of crime since then. It would be fine, though, if we made a broad rule that would encompass that person. Sure. In fact, what the government is its first argument is that. Absolutely, and I think this court should join the Sixth Circuit in holding that, but I do think when – But how is that what would be done at the founding, someone who's lived for all these years where firearms were very much allowed as part of the culture? How is that appropriate in any kind of history or tradition? Sure. At the founding, groups were disarmed because those groups were perceived as dangerous. You had the Loyalist Native Americans, other groups. We don't – we've already – that's – I think Justice Kavanaugh and others have addressed it. We don't deal with these prejudices and things. That's not what we would do. Sure, and I'm – That's not what we take into account. And I'm not advocating that those prejudices have any place in modern law. All of that to say is when you're asking what was the understanding at the founding, other courts have said – and I think the Fourth Circuit – or, excuse me, the Ninth Circuit most recently in Duarte has looked at those laws and said, look, what it shows you is that the governments disarm groups that they perceive to be dangerous. And so I do think drug traffickers as a whole are a group that are perceived – Even when they haven't trafficked drugs in 30 years and they haven't – Sure. And I think what Your Honor is getting at in part is the lifetime, the permanence of the ban and 922G1. That's very much part of the situation here and seems to just be breezily – I mean, we don't have a system of restoration of firearm rights of any robustness in this country at this time. That's right, although that is changing. So I'm glad that you brought this up. So 18 U.S.C. 925C has a provision in it that allows for the restoration of firearm rights. You can go to the attorney general and petition to get your rights back. And the attorney general does a dangerousness analysis. And then my reading of the statute says that if the government denies your right, you can actually petition to the courts. So you think we're going to see some of those claims now that these are being litigated this way? Absolutely. And that's the position that the government has taken in numerous cert oppositions recently in the Supreme Court. And the reason is because before this year, that authority had been delegated to the ATF. And Congress had not funded that authority. So it was in the statute, but it was not used in the way that you're acknowledging. The attorney general has now undelegated that authority from ATF. And the attorney general is beginning the process of standing that program back up and accepting those restoration applications. I don't have a case to point to you where it's happened yet. I think we're in the early stages of it. But that does, I think, provide a little bit of a relief valve on this lifetime disarmament. So to the extent the court is concerned about that, there is a mechanism that exists. And so that person from 30 years ago who would be swept up in your broad rule could have relief perhaps under certain circumstances. That's exactly right. I couldn't have said it better myself. So, again, the citation is 18 U.S.C. 925C. And if the court, and I apologize, this is not in any 28-J letters. I don't want to get too far down the rabbit hole. But if you look at the government-served oppositions in Diaz or Jackson or any of these sort of recent 922G1 cases, it talks about the reinvigoration of this procedure. We have these on every single sitting now, you know, these 922G cases. We have a couple of them every single sitting. And so this is the time for all these cases. Oh, absolutely. I understand. And part of the reason that we filed so many 28-Js in this case is because, you know, it's a hot issue in multiple circuits, and a lot of case law is coming out on these. Do you agree that you bear the burden of showing what the situation was at the founding? Yes. I think that's under Bruin and Rahimi, it's the government's burden. Once the defendant passed step one, which is does the Second Amendment protect the conduct about what you're describing here, then the burden then shifts to the government. Well, then can you address the founding-era documents that were discussed by your colleague? Yes. He cited several laws about smuggling. Just because some laws did not punish smuggling with death, it's important to remember that there are laws that did. So when you look at Blackstone talking about the English tradition, Blackstone says that smuggling for purposes of disguise to evade the law was a felony punishable without clergy. Disguised? Yes. I mean, he's smuggled in that cocaine on a bus from Mexico, and I don't think he had any intention of, you know, it wasn't obvious, it wasn't open in his lap. They had to pull him off the bus to find him. I thought the disguise is him. I'm sorry? Even in disguise to evade them. The disguise is for the object being smuggled? I read it as the object being smuggled. So that's Blackstone. And then moving forward, I think my friend on the other side talked about it a little bit, but the Tobacco Acts of Virginia, what Virginia set up a system by which for you to sell tobacco, you had to go and get a stamp of approval. And if you had a counterfeit stamp and you were smuggling tobacco under that counterfeit stamp, then Virginia made that a felony that was punishable by death. That law was enacted in 1730, and it seemed to be, best I can tell, it was on the books past the founding into the mid-1800s. So, again, in Virginia, it was a felony to smuggle this counterfeit tobacco, and the felony punishable by death. And I will note that in Diaz, this court also looked to the Virginia tradition of punishing horse theft by death. So even though there may be a few laws or a handful, more than a handful of laws where death was not prescribed, the idea that there are laws in which smuggling would result in capital punishment, I think the principle to be drawn from that is that legislatures at the founding understood that smuggling could be punished harshly, and under the analysis of Diaz, it's sufficient for disarmament. But horse theft and counterfeiting are not analogous to drug smuggling as analogous as smuggling alcohol, for example, which was not punishable by death. I think the tighter analogy is the counterfeit tobacco because that counterfeit tobacco is like a controlled substance. It's essentially got no value, unlike alcohol, that even if you sort of pass the tariff unlawfully, the alcohol itself wasn't necessarily a controlled substance. So for you to win here, it has to be counterfeit tobacco, not alcohol. Is that how you do that? We have to say that the historical analog, that you are correct in your historical analog. And that may be searching a little bit too finely. Rahimi teaches us we look at the principles. So I think the principle is that if you were smuggling contraband at the founding, you could be subject to capital punishment, and that loops in the trafficking and these other sort of contraband that you mentioned, so the stolen mail, the counterfeit securities, the counterfeit currency, all of that identifies that if you were trafficking in those sort of contraband, then you could be punished by death at the founding, and under that principle, you can be disarmed under 922G1. I see that I'm out of time. If the Court has any additional questions. Thank you. Thank you. Mr. Mickelson, you saved time for rebuttal. Thank you. John Hancock, the President of the Continental Congress and the signer of the Declaration of Independence, made his fortune smuggling. He, the Declaration of Independence itself criticized King George III for the limitations of trade. Smuggling was endemic to the early colonial republic. It led to the revolution. It was considered patriotic. Under federal law, after this country, after the Constitution was acted, the first limitations on trade was the Embargo Act of 1807. There was no penalty, no death penalty or anything like that. Smuggling, whether it be smuggling alcohol, whether it be smuggling molasses, whether it be smuggling wool, whether it be smuggling controlled substance, if it is an illegal activity, it can lead to danger. There are people who are dangerous smugglers in every instance. But that doesn't mean there was a death penalty for anyone convicted of that. Now, does that mean anyone convicted of those offenses is a class of people that is dangerous, a clear and present danger or whatever the language exactly was. And Rahimi, I submit that it was not true. And in this case, if you look at the specifics, there's so much innuendo here. Mr. Mancia was convicted of smuggling in 2010. He was from Brownwood, Texas. He went with a non-felon friend to a gun show in Fort Worth. Clearly the reason, I'm going to be candid, clearly the reason he would go to a gun show is so he could buy a gun, because he was a felon. They bought rifles to go hunting, not assault rifles, not machine guns. I'm sorry? How much cash did they have on them? They had a lot of cash. They had like $20,000. $20,000? Yes, sir. Yes, sir. They bought like five rifles or something, whatever it was. I mean, I think they were buying rifles and going hunting. I mean, we kind of get in the weeds, but we just have to go into all this innuendo. Like, rifles is what they were supposed to be drug trafficking? Is it legal to hunt with an AR-15? I guess I thought you couldn't hunt with an AR-15. You could. Well, not you couldn't. You should. It's not legal to hunt with an AR-15. You're saying it is legal? Oh, it could be legal. Yes, as long as it's not an automatic weapon. There are people that hunt with AR-15s. But we're not talking about AR-15s in this case. So it just, we have a convicted smuggler. What did they buy? Because I thought I heard AR-15. I didn't. I don't think so. They bought. Maybe not. Don't worry about it. Okay, I'm sorry. And I don't, to be candid, I don't think that's dispositive because many Texans hunt with an AR-15, as long as it's a legal weapon that doesn't automatically fire. I think you have to go to history and look at smuggling. The government has cherry-picked one law in Virginia when the whole, all the British colonial law, which prohibited smuggling, didn't impose a death penalty, didn't disenfranchise people from having a firearm. And then you look at the Declaration of Independence and you look at the early republic law, which I do think should carry greater weight, as Judge Kavanaugh pointed out in Rahimi, that you have to be careful that you don't incorporate pre-ratification law into the ratification if the ratification is meant to address the abuses of King George III and colonial law. Under colonial law, they had the death penalty against adultery, blasphemy. They had the death penalty only against black people if they did certain crimes, but not against white people if they did the same crimes. So Diaz does, Diaz is not about danger. So Diaz was about we get, if you have a conviction of theft, you can be prohibited because of the death penalty. If that doesn't apply in smuggling analogs, which I don't think it does, even though there's one exception in Virginia where they said it's a felony, that's all the Tobacco Act says is a felony, then you have to go to the other Virginia colonial law and say a felony could carry a capital offense. I don't think there's any evidence ever in colonial America relying on the book that the government cites, Mr. Banner's book, Death Penalty in America, that anybody was ever convicted or capital offense was ever imposed. So I think the question in a smuggling case is, is this inherently dangerous? So assuming that we were to parse pretty finely in our history, historical analogs like you wish us to do, just straightforward, it would seem that we would then end up with a law, our law in the Fifth Circuit would be, all theft is, drug trafficking isn't. How does that, I understand how you would get there in a historical analog approach, but how does that facially, does that look logical? I think all theft, that's Diaz, all theft is because it was like horse theft, it carried capital punishment. Smuggling generally did not, with one possible exception in Virginia in the colonial era, nothing after the early American Republic, and we have to look at American history and its views on smuggling at the time. And then you look, using smuggling as a historical analog, you look at the individual in these cases, and you see, and you use that Rahimi standard, where you say, is this person a clear threat? I'm just saying, when you would tell this, what does the Fifth Circuit do? Well, they do on this and they don't on that, and we would say that's because that's what Rahimi says. Yes, I think we're following this historical analog. Okay. Thank you. I think we have your arguments. We appreciate the very good arguments on both sides and the cases submitted.